UNION CARBIDE
CORPORATION, Plaintiff,

v.

TARANCON CORPORATION and
Gregorio Tarancon, Defendants.

No. 1:86–CV–1811–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 23, 1988.

Carol Ann Eller, John Treutlen Marshall, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., Peter DeLuca, Israel Blum, David M. Carter, John Foley Morgan & Finnegan, New York City, and Thomas I. O'Brien, Union Carbinde Law Dept., for plaintiff.

David I. Funk, Atlanta, Ga., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiff brings this action alleging that defendants willfully infringed plaintiff's patents, misappropriated plaintiff's trade secrets, tortiously interfered with plaintiff's prospective contractual relations, engaged in unfair competition and that de-

fendant Gregorio Tarancon breached a contract entered into with plaintiff. This court's jurisdiction is predicated upon 28 U.S.C. §§ 1338, 1331 and 1332. Currently before the court are plaintiff's motion for partial summary judgment and injunctive relief, motion to order its statement of material facts deemed admitted and motion to strike certain affidavit testimony and defendants' motion for leave to file an additional affidavit.

## FACTS

This action concerns an apparatus and process in which articles, including polymeric articles such as plastic containers, are treated with flourine, a highly reactive gas. Flourination, a chemical reaction between flourine and the surface of the container, creates a barrier on the surface of a treated container which reduces the permeability of the container to a stored liquid. Treating or "flourinating" plastic containers allows the treated containers to hold various liquids such as gasoline, solvents, aerosols and propellants which would otherwise escape from untreated containers. Complaint, ¶ 7; Answer, ¶ 4. The flourination of articles significantly increases the "shelf life" of many products sold in flourinated containers and allows the storage of certain products in plastic containers which would otherwise have to be stored in expensive metal or breakable glass containers.

Between 1971 and 1979 plaintiff, Union Carbide, conducted research and development work on the flourination of polymeric materials at its Sterling Forest research facility located in Tuxedo, New York. Affidavit of Garrett R. Graham, ¶¶ 5–8 ("Graham Affidavit"). In 1973 Union Carbide hired defendant Gregorio Tarancon ("Tarancon") as a chemical engineer. In 1980 Union Carbide moved its flourination pilot plant from Tuxedo, New York to Keasby, New Jersey. Graham Affidavit, ¶¶ 9–10. Tarancon, who was Manager of Process Engineering, helped to reassemble and modify the pilot plant in Keasby, New Jersey. Tarancon Deposition, June 29, 1987, pp. 21, 36.

At its pilot plants Union Carbide researched and developed and patented a commercially successful flourination system. Graham Affidavit, ¶¶ 6, 40–43. Plaintiff spent millions of dollars and invested thousands of man hours to develop a commercially feasible and successful flourination system and it has licensed its commercial flourination apparatus, processes and know-how to United States and foreign companies. Id.[1] Between 1980 and 1984, when Tarancon left the employ of Union Carbide, Tarancon was active in working on the flourination system at Union Carbide. Tarancon Deposition, June 29, 1987, pp. 55, 83–86.

When he was hired by Union Carbide in 1973, Tarancon executed a "Memorandum of Employee's Agreement" whereby he agreed to keep confidential and not to use or disclose any secret or confidential information of Union Carbide and to assign to Union Carbide all inventions he made in the course of his employment. Plaintiff's Statement of Material Facts, ¶ 15. While employed by Union Carbide, Tarancon was the sole inventor on two patents relating to flourination which he duly and legally assigned to Union Carbide. Id., ¶ 19. When Tarancon voluntarily resigned from employment with Union Carbide in December 1984 he signed a written acknowledgement of his obligations under the earlier exe-

---

1. In their response to plaintiff's statement of material facts, defendants do not specifically controvert plaintiff's contention that it spent millions of dollars and invested thousands of man hours to research and development of a flourination system or that it developed and patented a successful flourination system or that it has licensed its flourination processes, apparatus and know-how to U.S. and foreign companies. Defendants only argue that plaintiff "has not proven these allegations." Plaintiff, however, submitted the affidavit of Garrett Graham, given under oath, to support its contentions. On a motion for summary judgment, once the movant has supported its motion, the adverse party must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ. P. 56(e). Pursuant to the Local Rules of the Northern District of Georgia, "[a]ll material facts contained in the moving party's statement which are not specifically controverted ... shall be deemed to have been admitted." N.D.Ga. L.R. 220–5(b)(2).

cuted Memorandum of Employee's Agreement. *Id.*, ¶ 17. Tarancon has had actual knowledge since 1980 that Union Carbide is the owner of five patents pertaining to flourination processes and apparatus. *Id.*, ¶ 21.

In December 1984 defendant Tarancon Corporation ("the Corporation") was incorporated and Tarancon was named president and director of the Corporation. *Id.*, ¶ 23. Although Tarancon was unsure of the type of flourination apparatus the Corporation would use, he began contacting suppliers for equipment for a flourination facility soon after he resigned from Union Carbide. Tarancon developed and personally supervised the construction of defendants' flourination processes and apparatus. *Id.*, ¶ 26. Tarancon and two co-inventors, Efrain Acevedo and Abel Saud, prepared a patent memorandum and, on March 19, 1985, applied for what was subsequently issued as U.S. Patent No. 4,576,837 (the " '837 Patent"). *Id.*, ¶¶ 26–28. The '837 Patent, which Tarancon duly assigned to the Corporation, describes the flourination processes used by defendants.

Plaintiff alleges that defendants' flourination processes and apparatus infringe plaintiff's patented process and apparatus, Patent numbers 4,081,574 (the " '574 Patent") and 3,998,180 (the " '180 Patent") respectively. Plaintiff further contends that defendants' alleged acts of infringement have been willful and deliberate. In addition, plaintiff alleges that defendant's '837 Patent discloses some of Union Carbide's trade secrets. Plaintiff contends that defendants, by allegedly disclosing Union Carbides multiple dwell flourination method ("MDFM") in their '837 Patent, have misappropriated and used for their benefit, without plaintiff's consent, plaintiff's trade secrets in violation of its exclusive right to those trade secrets.

Plaintiff brings this motion for partial summary judgment on the issues of whether defendants infringed plaintiff's '180 Patent (flourination apparatus) and if so, whether the infringement was willful and whether defendants misappropriated plaintiff's MDFM "trade secret." In its motion

for partial summary judgment plaintiff also seeks to have the court enjoin defendants and dismiss all three counts of defendants' counterclaim. Plaintiff further moves the court to strike certain paragraphs from defendants' expert's affidavit and to deem Plaintiff's Statement of Material Facts admitted. Defendants move the court for leave to file an additional affidavit in opposition to plaintiff's motion for partial summary judgment. Further facts will be disclosed as necessary for discussion of the motions.

DISCUSSION

I. *The Non–Summary Judgment Motions*

A. Plaintiff's Motion to Strike

■ In opposition to plaintiff's motion for partial summary judgment defendants submitted the affidavit of John L. Margrave who is a Professor of Chemistry at Rice University and Vice President for Research at the Houston Area Research Center. Professor Margrave is the defendants' technical, scientific expert. He does not consider himself an expert in patent law and he is not offered by defendants as a legal expert. Deposition of John Lee Margrave, November 16, 1987, p. 18. Nonetheless, at paragraphs 28 through 31 of his affidavit, Margrave opines on the "substantial question as to whether Claim 1 of the '180 Patent is valid in view of the prior art." Plaintiff seeks to strike these paragraphs on the ground that Margrave is not qualified to testify as to the validity of plaintiff's '180 Patent and thus such testimony would not be admissible under Rule 702 of the Federal Rules of Evidence.

■ The court agrees with plaintiff that the question of a patent's validity is a legal one and that Margrave's testimony on the issue of whether plaintiff's '180 Patent is valid should be struck. Not only would Margrave's testimony on the issue be inadmissible in evidence and is thus not in compliance with Rule 56(e) of the Federal Rules of Civil Procedure, but by raising the issue in the Margrave affidavit, defendants are apparently attempting to bring in the defense of invalidity through the back

door. In their answer, defendants do not defend on the ground that plaintiff's '180 Patent is allegedly invalid. Therefore, the issue of the validity of the '180 Patent is not properly before the court and paragraphs 28 through 31 of the Margrave affidavit must be struck.[2]

### B. Plaintiff's Motion to Have its Facts Deemed Admitted

Pursuant to the local rules of this court, plaintiff attached to its motion for partial summary judgment a statement of facts as to which it contends there is no genuine issue to be tried. In response, defendants filed, the day after the date by which the court had directed defendants to respond, a "statement disagreeing with plaintiff's statement of undisputed facts." In that statement, defendants responded to and took issue with 29 of plaintiff's 69 paragraphs of allegedly undisputed facts. Because defendants filed their statement a day late and failed to comply with the letter of this court's local rules, plaintiff moves the court to deem plaintiff's statement of facts admitted and its motion for partial summary judgment unopposed.

Defendants' lead counsel is located in New Jersey and has been filing materials via air express. Defendants responded to plaintiff's motion to have its facts deemed admitted by supplementing the record with specific responses to each of plaintiff's numbered statement of facts and a separate statement of facts defendants contend are in dispute. Thus, defendants did belatedly comply with the requirements of local rule 220–5. Although the court does not condone defendants' tardiness and failure to follow the rules of this court, it will not take the draconian measure of granting plaintiff's motion on the ground it is deemed unopposed in light of defendants' eventual compliance with the rules.

### C. Defendants' Motion for Leave to File a New Affidavit

Defendants seek leave to supplement their brief in opposition to plaintiff's motion for partial summary judgment with the affidavit of Anneliese Rimensberger who was employed by Union Carbide as a project engineer from September 1983 to May 1, 1987. Defendants contend that they obtained Ms. Rimensberger's affidavit late because she did not contact Tarancon until December 1987 and that prior to her contacting him he did not attempt to take her testimony because he did not know what knowledge or information she had and because he believed she still worked for plaintiff and would not want to jeopardize her job there. Plaintiff opposes defendants' motion for leave to add Ms. Rimensberger's affidavit on the grounds of inexcusable delay and that the information in the affidavit is not based on personal knowledge and there is no showing that she is competent to testify to the matters contained in the affidavit.

■■■ This court can, in its discretion, allow defendants to file an affidavit after the time for filing has expired. In this case, however, the court declines to do so. Plaintiff argues that it should have an opportunity to depose Ms. Rimensberger if her testimony is to be used to oppose its motion. Because of the late filing, plaintiff is unduly prejudiced. Moreover, although Ms. Rimensberger alludes to her personal knowledge of the facts contained within the affidavit, she uses such language as "I was not aware" or "it was my understanding" in various places in her testimony. The court therefore denies defendants' motion to add the Rimensberger affidavit. The court will, however, grant the parties extra time to depose Ms. Rimensberger should

---

**2.** A patent is presumed valid, 35 U.S.C. § 282, and the party asserting invalidity must prove it with facts supported by clear and convincing evidence. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 872 (Fed.Cir.1985). Plaintiff also moves to strike ¶ 13 of the Margrave affidavit on the ground the testimony is irrelevant and thus inadmissible. The court disagrees with plaintiff that the testimony in ¶ 13 is irrelevant.

Rule 401 of the Federal Rules of Evidence provides that "relevant evidence" is anything having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Margrave's testimony in ¶ 13 of his affidavit bears on the issue of whether defendants are engaged in unfair competition with plaintiff's licensee in Georgia.

either believe her testimony would aid in the trial of this matter.

## II. *Plaintiff's Motion for Partial Summary Judgment*

Plaintiff moves for partial summary judgment in its favor on the issues of whether defendants have infringed its '180 Patent and if so, whether the infringement was willful and whether defendants misappropriated its MDFM trade secret. Plaintiff further moves the court to enjoin defendants from continuing such allegedly unlawful activity and to dismiss all three of defendants' counterclaims. The court will consider each issue separately.

### A. Infringement of Plaintiff's '180 Patent

Plaintiff contends that defendants' flourination apparatus directly infringes Claim 1 of plaintiff's '180 Patent. The invention claimed under Claim 1 of plaintiff's '180 Patent is "An apparatus for exposing articles to a gaseous fluid at an essentially predetermined composition wherein said fluid is comprised of or contains one or more components which are reactive with the surface of said articles...." Plaintiff's '180 Patent, column 18, lines 6–12. The apparatus claimed under Claim 1 is comprised of six parts which are enumerated in subsections (a) through (f) in Claim 1.[3] Plaintiff contends that an element-by-element comparison of Claim 1 of its '180 Patent with defendants' apparatus shows as a matter of law that defendants' apparatus directly infringes plaintiff's Patent.

Plaintiff correctly addressed the question of whether defendants' apparatus literally infringes its '180 Patent by comparing the asserted Claim with the product accused of infringement. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir. 1985). Infringement will be made out if the accused device falls clearly and definitely within the properly interpreted claim of the Patent. *Id.; Lam, Inc. v. Johns–Manville Corp.*, 668 F.2d 462, 471 (10th Cir.), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982). A two-step inquiry must be conducted to determine whether direct infringement has occurred:

> First, the scope of the claims must be ascertained, and then the trier must decide whether the claims cover the accused device. The latter step, which is the ultimate determination of infringement, is a fact issue, and a motion for summary judgment on that issue should be approached with great care by the district court.

*Palumbo, supra*, 762 F.2d at 974 (citing *D.M.I. Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir.1985).

Generally, ascertaining the scope of a claim, or claim construction, is a question of law. Claim construction involves examining the specifications, prosecution history, prior art and other claims and "necessarily precedes determining whether the claims in suit read on the accused devices." *Lemelson v. United States*, 752 F.2d 1538, 1549 (Fed.Cir.1985). If the language of a claim is not disputed then the scope of the claim may be determined as a matter of law. "When the meaning of a term in the claim is disputed [however,] and extrinsic evidence is necessary to explain the term, then an underlying factual question arises...." *Palumbo, supra*, 762 F.2d at 974. Thus, both steps in the two-

---

**3.** The parts of the apparatus are: "a. a first sealed reaction chamber having sealable access means for the introduction and removal of said articles; b. a second sealed chamber having first conduit means connected to at least one source of said fluid and optional sealable access means for the introduction and removal of said articles, whereby said second chamber may optionally be utilized as only a holding chamber for said gaseous fluid or additionally as a second reaction chamber; c. a conduit system connecting said first and second chamber; d. a vacuum producing transfer means and valve means operatively associated with said conduit system for selectively creating pressured differentials between said chambers, whereby each chamber may be evacuated or changed with said gaseous fluid, and fluids transferred back and forth between said chambers after the fluid treatment of said articles; e. said apparatus including pressure and temperature control means; and f. means operatively associated with said conduit system and adapted to separate out reaction by-products and contaminants."

part inquiry into infringement may present factual matters not appropriately resolved on a motion for summary judgment. *See SRI International v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1116 (Fed.Cir.1985) ("infringement is itself a fact issue [and] a district court must approach a motion for summary judgment of infringement or noninfringement with a care proportioned to the likelihood of its being inappropriate").

■ A patent claim may be infringed either "literally" (directly) if each element of the patent claim directly matches each element of the accused device—which determination is made through the two step inquiry above—or by an "equivalent" device if the accused apparatus "performs substantially the same function in substantially the same way to obtain the same result...." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)). Even if the claim words read literally on an accused device, however, either party may make use of "materials extraneous to the words of a claim, to give them a 'special meaning' which will support an assertion of actual infringement/non-infringement under the doctrines of equivalents/reverse equivalents." *SRI International, supra*, 775 F.2d at 1117 n. 11.

■ If the claim language as written reads clearly on an accused device, thus giving rise to literal infringement, an accused infringer may argue that the reverse doctrine of equivalents applies to prove that the accused device does not infringe the patent-in-suit. The reverse doctrine of equivalents protects the accused infringer when "a product precisely described in a patent claim is in *fact* 'so *far* changed in principle' that it performs in a '*substantially different way*' and is not therefore an appropriation...." *Id.* at 1123 (quoting *Graver Tank, supra*, 339 U.S. at 608–09, 70 S.Ct. at 856–57) (emphasis in *SRI* ).

■ While the reverse doctrine of equivalents may be raised as a defense by

an accused infringer, the patentee may try to prove infringement through the doctrine of equivalents. If an element in a claim is "expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof, ... such claim shall be construed to cover the corresponding structure, material or acts described in the specification and *equivalents thereof.*" 35 U.S.C. § 112 (emphasis added). Whether an accused device is an equivalent of the embodiment described in the claim is a question of fact. Likewise, a finding of equivalence (or reverse equivalence) is a determination of fact. *Palumbo, supra*, 762 F.2d at 975.

In the instant action the parties have briefed and rebriefed the court several times. In its initial brief in support of its motion for summary judgment plaintiff argues that defendants' apparatus literally infringes Claim 1 of plaintiff's '180 patent because it allegedly falls clearly and definitely within the claim. Defendants countered with two arguments: first, defendants disputed the scope or construction of Claim 1 of the '180 patent as set forth by plaintiff and second, defendants contested plaintiff's description of the accused device (defendants' flourination apparatus). In its reply brief plaintiff raised the issue of equivalents and suggested that the "means plus function" language of the '180 patent allows the court to determine as a matter of law that defendants' apparatus is the equivalent of the apparatus claimed in the '180 patent.

Both parties filed supplemental briefs as well. Defendants appear to again dispute the meaning of certain terms contained in Claim 1 of the '180 patent as well as the correct characterization of defendants' apparatus. From defendants' briefs, the court also has gleaned that defendants may be asserting the doctrine of reverse equivalents as a defense. Defendants argue that the term "sealed" in the '180 patent means that two chambers are sealed from each other. In addition, defendants contend that plaintiff's apparatus provides for the intermittent flourination of polymeric materials whereas defendants' apparatus alleg-

542

edly requires a continuous system of flourination. Thus defendants seem to allege that while their apparatus performs the same function as plaintiff's, it does so in a substantially different way.

■ The court has carefully reviewed the exhibits to the briefs, affidavits and depositions presented in this case. Although plaintiff's arguments were much more persuasively set forth than were defendants, the court is not convinced that defendants' apparatus as a matter of law infringes the apparatus claimed under Claim 1 of plaintiff's '180 patent. Because the description of the accused device in this case is not uncontested, there remains a question of fact whether its elements match each function of the patent claim. Furthermore, even if the court could find that the claim language reads clearly on defendants' accused apparatus, there would remain a question of fact whether defendants' apparatus performs the flourination function in a substantially different way than does plaintiff's apparatus.

### B. Willful Infringement

Plaintiff moves the court to find that defendants willfully infringed plaintiff's '180 patent. While defendants concede that Tarancon had knowledge of plaintiff's patents, the court cannot address the question of willfulness without first finding infringement by defendants.

### C. Misappropriation of Trade Secret

■ Plaintiff alleges that it owns a trade secret, the multiple dwell flourination method ("MDFM"), which defendants have misappropriated and used for their own benefit. Plaintiff contends that the flourination method set forth in defendants' '837 patent is the same as plaintiff's MDFM and that by disclosing it in their patent, defendants have misappropriated plaintiff's "trade secret." Defendants argue that the MDFM is not a "trade secret" as legally defined and protected and that the flourination method practiced by defendant is different from the MDFM as actually practiced by plaintiff.

Under Georgia law a trade secret, "within the rules pertaining to the rights which can be protected by injunction, is a plan, process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended." *Thomas v. Best Manufacturing*, 234 Ga. 787, 789, 218 S.E.2d 68 (1975) (quoting 43 C.J.S. 750, Injunctions, § 148); *See also Outside Carpets, Inc. v. Industrial Rug Co.*, 228 Ga. 263, 268, 185 S.E.2d 65 (1971). The determination of whether a process, plan, mechanism or the like is a trade secret, "which must have the element of exclusivity, has been treated as a fact question" in Georgia. *Wilson v. Barton & Ludwig, Inc.*, 163 Ga.App. 721, 729, 296 S.E.2d 74 (1982) (citing *Thomas v. Best, supra*). "To a great extent, the factual determination of novelty depends upon the existence or absence of evidence that the idea has already been in use and is within the public's knowledge." *Id.* at 725, 296 S.E.2d 74.

Plaintiff contends that its MDFM is a flourination process known only to Union Carbide and its employees and licensees to whom the process had to be confided in order to apply it to its intended uses. Defendants argue that multiple flourination processes have been known to people in the trade for years as has the MDFM process of removing by-products. Furthermore, defendants allege that plaintiff's description of its MDFM in briefs before this court is misleadingly similar to defendants' process and is inaccurate. Tarancon, who according to plaintiff's lab notes worked with Garrett Graham on the MDFM, testified in an affidavit that Union Carbide excluded certain steps and mischaracterized others in describing the MDFM.

Union Carbide argues that defendants' references to other works in the trade describing multiple or re-flourination and removal of reaction by-products are not the same as its MDFM and thus, that the MDFM is exclusive and known only to confidants of Union Carbide. Because defendants have raised a question of fact regarding plaintiff's actual MDFM practice, this court cannot say as a matter of law that

the MDFM is a "trade secret" within the meaning of Georgia law. In addition, Tarancon testified that he is capable of inventing and has invented in the past other flourination processes within a matter of a few months. Therefore, there is a question of fact whether Tarancon used his own independent, legitimate thought processes to create defendants' flourination process and whether that process is indeed different from plaintiff's MDFM.

### D. Injunctive Relief

Plaintiff moves the court to enter an injunction against defendants enjoining them from further infringing plaintiff's '180 Patent and from further benefitting from the misappropriation of its trade secret. In view of this court's denial of plaintiff's motion for summary judgment on the issues of infringement and misappropriation, an injunction at this time cannot lie.

### E. Defendants' Counterclaims

#### 1. *Tortious Interference*

In Count I of their counterclaim defendants allege that plaintiff has contacted several actual and potential customers of defendants and advised them of the instant suit and/or threatened them with suit if they do business with defendants. Defendants list, on information and belief, three customers of defendants with whom plaintiff allegedly interfered. Plaintiff, in its brief in support of its motion for summary judgment shows that defendants have presented no evidence that plaintiff actually contacted defendants' current or prospective customers, advised them of the lawsuit, or threatened them with suit. Indeed defendants admit that actual and potential customers have learned of the lawsuit "through the trade" and defendants' employee admitted that, in response to inquiries, *she* advised actual and potential customers that defendants had been sued by Union Carbide. Deposition of Daisy Guevera, April 27, 1987, pp. 40–41.

To establish a cause of action for tortious interference with business relations defendants must show that Union Carbide "(1)

acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with [defendants], and (4) [that defendants] suffered some financial injury." *Hayes v. Irwin,* 541 F.Supp. 397, 429 (N.D.Ga.1982) (Vining, J.), *aff'd,* 729 F.2d 1466 (11th Cir.1984). At trial, defendants would bear the burden of proving all four prongs of the test for tortious interference with their business relations. In response to plaintiff's showing that there is no evidence that it acted improperly and intentionally induced customers to discontinue business with defendants, defendants only reiterate the allegations of their counterclaim that, upon information and belief, plaintiff has contacted and interfered with at least three named customers.

On a motion for summary judgment, once a movant supports its motion, as plaintiff has here, the adverse party "may not rest upon the mere allegations or denials of [its] pleading," but in response "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e). The Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986), noted that the standard for granting summary judgment mirrors the standard for granting a directed verdict. The Court held that, after adequate time for discovery, Rule 56(c) *"mandates* the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.,* 106 S.Ct. at 2552–2553 (emphasis added). The non-movant may not rely solely on its pleadings to counter the movant's showing that it is entitled to summary judgment. *Pines v. Warnaco, Inc.,* 706 F.2d 1173, 1178 (11th Cir.1983).

Defendants have failed to present any evidence of specific facts showing that there is a genuine issue of whether plaintiff tortiously interfered with defendants' actual and prospective business relations. Defendants only reiterated the allegations in their pleading and declared that Taran-

con would testify at trial as to the alleged damages defendants have suffered. As the Supreme Court acknowledged in *Celotex,* one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims. Because defendants would bear the burden of proving all four prongs of the test for tortious interference of business relations and they have failed, even after discovery, to establish the existence of any elements essential to their case, summary judgment against defendants on Count I of their counterclaim is mandated.

### 2. *Unfair Competition*

■ In Count II of their counterclaim defendants allege that plaintiff has engaged in unfair competition. The sum total of defendants' allegations supporting their claim of unfair competition are that "By [bringing] this action, plaintiff seeks to appropriate to itself the novel method developed by defendants and their patent and to drive defendants out of business and thereby unlawfully prevent competition" and "On information and belief, plaintiff seeks to unlawfully monopolize a segment of the plastic coating business." Plaintiff moves the court to dismiss defendants' unlawful competition claim for failure to state a claim. In response to plaintiff's motion to dismiss Count II of their counterclaim, defendants merely argue that defendants are "entitled to a hearing" on their allegations that "by this action, plaintiff is attempting to unlawfully obtain defendants' patent and is attempting to unlawfully extend its monopoly under its patents to the detriment of defendants."

Defendants' counterclaim for unfair competition appears to be a melding of their tortious interference counterclaim and abusive litigation counterclaim set forth in Count III. As noted above, defendants failed to set forth any facts sufficient to overcome plaintiff's motion for summary judgment on defendants' tortious interference counterclaim. In their response to plaintiff's motion to dismiss Count II of the counterclaim, defendants simply repeated the allegations of their pleading. There-

fore, insofar as Count II realleges a kind of tortious interference, defendants again failed to present any specific facts showing there is an issue for trial. If defendants' "unfair competition" claim stands solely on their contention that, by filing the instant lawsuit plaintiff is committing unfair competition, the claim must fail for the reasons stated below with regard to their abusive litigation claim. Defendants' contentions in Count II do not state a claim for unlawful monopolization under federal law and furthermore, defendants have not set forth any specific facts to support their allegation of unlawful monopolization and competition. Therefore, Count II of defendants' counterclaim must be dismissed.

### 3. *Abusive Litigation*

■ In the Third Count of their counterclaim defendants contend that plaintiff brought the instant action in order to harass defendants and that the action lacks substantial justification, is frivolous, groundless and vexatious. Defendants do not cite a basis for their "abusive litigation" cause of action. If defendants' claim is grounded on Georgia Official Code § 9-15-14 (litigation costs and attorneys fees assessed for frivolous actions), the claim must be dismissed because that section only pertains to actions brought "in any court of record of this state." If defendants intend to bring an abusive litigation claim under the common law doctrine enunciated by the Georgia Supreme Court in *Yost v. Torok,* 256 Ga. 92, 344 S.E.2d 414 (1986), it likewise must fail.

This court agrees with other courts in this district that a *Yost* counterclaim, "although designated as a compulsory counterclaim by the Georgia Supreme Court, is a permissive counterclaim in a federal court." *See Majik Market v. Best,* 684 F.Supp. 1089, 1091 (N.D.Ga.1987) (O'Kelley, J.); *A.L. Williams Corp. v. Faircloth,* No. C85–1677A, Slip op. at 6 (N.D.Ga. March 19, 1987) (Freeman, J.). As a permissive counterclaim, defendants' abusive litigation claim must independently satisfy the requirements for diversity jurisdiction. Although defendants here failed to allege that the amount in controversy

over the abusive litigation claim exceeds $10,000, defendants seek leave of the court to amend the counterclaim to allege the jurisdictional prerequisite. Even if defendants properly alleged the jurisdictional requirements for a *Yost* claim, however, this court believes that such a claim, like a claim brought under Ga. Off'l Code Ann. § 9–15–14, may not be brought in federal court but, rather, must be limited to actions brought in the state courts of Georgia.

Although the Georgia Supreme Court in *Yost* did not specifically limit the newly created "abusive litigation" cause of action to actions brought in Georgia state courts, it did "adopt the legislative language of new O.C.G.A. § 9–15–14" which, as noted above, does confine the cause of action to courts of record of the State of Georgia. *Yost, supra,* 256 Ga. at 95, 344 S.E.2d 414. In addition, the *Yost* claim, although labelled a "tort", is arguably a "procedural" device, rather than a "substantive" cause of action, which the federal courts would not be subject to follow. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); 28 U.S.C. § 2072.

This court believes that, for purposes of determining the applicability of a *Yost* claim in federal court, the Georgia Supreme Court's reasoning rather than nomenclature should be analyzed. The *Yost* court noted that while Ga. Off'l Code Ann. § 9–15–14 provides an award of attorneys' fees and expenses of litigation for abusive litigation, the code section is limited to those two elements of damages. Recognizing that the tort system can and should provide within its own structure a means for preventing its abuse and for special damages other than attorneys' fees and expenses of litigation, the *Yost* court defined a "tort" of abusive litigation.

The *Yost* court set forth the elements of the cause of action as follows:

Any person who shall assert a claim, defense, or other position with respect to which there exists such a complete absence of any justiciable issue of law or fact that it reasonably could not be believed that a court would accept the asserted claim, defense or other position; or any party who shall bring or defend an action or any part thereof, that lacks substantial justification, or is interposed for delay or harassment; or any party who unnecessarily expands the proceeding by other improper conduct, including, but not limited to, abuses of discovery procedures, shall be liable in tort to an opposing party who suffers damage thereby.

*Id.* 256 Ga. at 96, 344 S.E.2d 414. The court specified that the *Yost* claim is derivative in nature and must be pleaded as a compulsory counterclaim that must be brought as part of the underlying action and resolved in one trial. Given the *Yost* court's declaration that the abusive litigation claim is derivative in nature and its comment that the tort system should contain a structure for preventing abuse, over-and-above a means of awarding attorneys' fees and expenses of litigation, an inference can be drawn that the *Yost* abusive litigation claim was intended to serve as a procedural device through which an action could be monitored and sanctions imposed.

This court is inclined to interpret a *Yost* claim, for purposes of federal court applicability, as a procedural device in light of the *Yost* court's apparent intention in creating the claim and the similarity of the elements of the *Yost* claim and the language of Rule 11 of the Federal Rules of Civil Procedure. Rule 11, like a *Yost* abusive litigation claim, provides a mechanism for monitoring litigation, imposing sanctions on those who bring claims or defenses that are not warranted by law or fact or are interposed to delay or harass and compensating the person against whom the abusive or unwarranted litigation was brought.[4]

This court's determination that a *Yost* claim may not be raised in federal court will not result either in forum-shopping or inequitable administration of the laws, as the *Erie* doctrine aims to avoid, because the same rights as set forth in *Yost* exist in the federal court through the implementation of Rule 11. In addition, the Federal

---

4. The *Yost* claim specifies as one element for recovery abuses of discovery procedures. The Federal Rules of Civil Procedure provide a

means, in addition to Rule 11, for monitoring and bringing into check just such discovery abuses. *See* Fed.R.Civ.P. 37.

**546**

Rules are broad enough to cover the goals of *Yost* and therefore *Erie* does not command the application of *Yost.* *See Hanna v. Plumer,* 380 U.S. 460, 468–70, 85 S.Ct. 1136, 1142–43, 14 L.Ed.2d 8 (1965); *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749–53, 100 S.Ct. 1978, 1984–86, 64 L.Ed.2d 659 (1980). Rules 11 and 37 of the Federal Rules of Civil Procedure are designed to address and very adequately redress damages from abusive litigation in federal court. For all the above reasons, the court dismisses Count III of defendants' counterclaim.

CONCLUSION

In summary, the court GRANTS plaintiff's motion to strike paragraphs 28 through 31 of the Graham Affidavit and DENIES plaintiff's motion to deem its Statement of Facts admitted and its motion for partial summary judgment unopposed. The court DENIES defendants' motion to add a new affidavit but allows the parties extra time to depose Ms. Rimensberger if necessary. The court PARTIALLY GRANTS and PARTIALLY DENIES plaintiff's motion for partial summary judgment: the court GRANTS the motion with regard to defendants' counterclaim and hereby DISMISSES all three counts of defendants' counterclaim and the court DENIES the motion with regard to all other issues.