AMERICAN PERMAHEDGE,
INC., Plaintiff,

v.

BARCANA, INC. and National Metal
Industries, Inc., Defendants.

No. 92 Civ. 6369 (SWK).

United States District Court,
S.D. New York.

July 11, 1994.

Rosenman & Colin, New York City by Albert L. Jacobs, Jr., Mark H. Sparrow, David A. Slossberg, for plaintiff.

Dvorak and Traub, New York City by Richard B. Klar, for defendants.

## MEMORANDUM OPINION AND ORDER

SHIRLEY WOHL KRAM, District Judge.

Plaintiff American Permahedge, Inc. ("American Permahedge") moves, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, for an order enjoining defendant Barcana, Inc. from manufacturing, using or selling Barcana's "Evergreen Hedge" product on the grounds that the "Evergreen

Hedge" infringes upon plaintiff's patent for the "American Permahedge." Defendants Barcana, Inc. and National Metal Industries, Inc.[1] (collectively "Barcana") oppose plaintiff's motion and cross-move for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing this action on the grounds that there is no genuine issue of material fact as to non-infringement and invalidity of plaintiff's patent. For the reasons stated below, the Court denies both motions.

## BACKGROUND [2]

In July 1987, American Permahedge was incorporated for the sole purpose of marketing and selling the "American Permahedge," artificial shrubbery that creates the appearance of a hedge when threaded through the holes of a chain link fence. The "American Permahedge" is composed of individual units (the "branches") consisting of a pair of metal wires twisted together (the "twig") through which are threaded a multitude of stiff, green plastic bristles that resemble evergreen needles (the "needles"). The branches are then woven into the openings of a chain link fence so that the needles overlap, forming a hedge.

On September 29, 1987, Francis M. Paradise ("Paradise"), one of the inventors of the "American Permahedge," applied for a patent. In January 19, 1989, the Patent Examiner notified Paradise that his patent application was rejected, under 35 U.S.C. § 102(b),[3] as being anticipated by U.S. Patent No. 3,343,357 (the "Goodridge Patent"). The Patent Examiner found that the Goodridge Patent met the claimed structure of "American Permahedge's" branches and, as to insertion into a chain-link fence, that language was "purely functional in the sense of intended use," and therefore was entitled to no patentable weight.

In response, by a patent amendment dated March 1, 1989, Paradise distinguished the Goodridge Patent, stating:

In Goodridge the fibers [needles] are bunched together in discontiguous clumps, leaving defined spaces between each clump at the root, i.e., where the wires are twisted. Further, the fibers [needles] are bent permanently at an angle to the axis so that a planar array capable of forming shrubbery is not possible. As a result, Goodridge could not provide a densely packed contiguous planar array simulative of shrubbery. Goodridge provides a tree branch but not shrubbery.

On October 10, 1989, United States Patent No. B1 4,872,647 (the "'647 patent") for a "Decorative Attachment For A Chain Link Fence" was issued to Paradise, who promptly assigned it to American Permahedge. The hedge, which is manufactured by another company, is American Permahedge's sole product.

## A. The '647 Patent

The '647 patent contains five claims. Three of those claims, Claims One, Four and Five, are at issue here. Reduced to its essential components, Claim One provides for a chain link fence and camouflage assemblies (branches), consisting of "stiff densely packed filaments" (needles) along a wire "axial support" (the twig). Specifically, Claim One recites in pertinent part:

[C]amouflage assemblies comprising a central elongated axial support element and relatively stiff densely packed filament means fixedly carried by said support element and extending laterally of the axis thereof, said filament means forming a bush-like planar array that extends along the entire length of said support element.

1. American Permahedge has not moved for injunctive relief against co-defendant National Metal Industries, Inc. because a preliminary injunction against Barcana, Inc., the supplier to National Metals of the allegedly infringing product, would, in plaintiff's opinion, eliminate any infringement by National Metal Industries, Inc.

2. Unless otherwise indicated, the Court relies upon Defendants' Statement of Uncontested Facts in Support of Defendants' Cross–Motions

for Summary Judgment and Plaintiff's Local Rule 3(G) Statement, for this statement of relevant facts.

3. Section 102(b) states in relevant part: "a person shall be entitled to a patent unless ... (b) the invention was described in a printed publication ... more than one year prior to the date of the application for patent in the United States."

Claims Four and Five differ from Claim One in that they describe combining the camouflage assemblies in specific types of chain link fences. Specifically, Claim Four recites in pertinent part:

decorative attachment comprising a length of a cooperating pair of wires twisted lengthwise about each other with laterally extending plastic fibers engaged in the twists thereof, that said filaments present a generally planar hedge-like array, said plastic fibers thereafter move under the bias of the resiliency of the plastic construction material thereof into positions extending laterally of said twisted wire length, to substantially cover the corresponding openings in said fence by occluding the openings.

Claim Five recites in pertinent part:

decorative attachments comprising a length of a cooperating pair of wires twisted lengthwise about each other with laterally extending plastic fibers engaged in the twists, said filaments present a generally planar hedge-like array, said plastic fibers thereafter move under the bias of the resiliency of the plastic construction material thereof into positions extending laterally of said twisted wire length, to substantially cover the corresponding openings in said fence.

### B. The "Evergreen Hedge"

In June 1991, Paradise first learned of Barcana's "Evergreen Hedge" product. Like the "American Permahedge," the "Evergreen Hedge" is a decorative attachment for a chain link fence that is composed of twisted wires covered by stiff green bristles that, when threaded through a chain link fence, create the appearance of a natural hedge. Like the "American Permahedge," the "Evergreen Hedge" is sold with instructions on how to combine the individual garlands with a chain link fence to form a hedge.

In November 1991, upon purchasing Barcana's product and comparing it with the "American Permahedge," Paradise concluded that Barcana was infringing upon the '647

patent. Shortly thereafter, by letter dated November 21, 1991, American Permahedge's counsel notified Barcana that the manufacture and sale by Barcana of its "Evergreen Hedge" infringed Claims One, Four and Five of American Permahedge's '647 patent. Additional letters were sent on December 5, 1991 and February 14, 1992, renewing American Permahedge's objections to the manufacture and sale of Barcana's "Evergreen Hedge."

By letter dated December 12, 1991, Barcana denied any infringement, stating: "It is clear that Barcana's 'Evergreen Hedge' product does *not* infringe the ['647] patent" and that the "permahedge product itself is not covered by the ['647] patent." Specifically, Barcana argued that the needles which form the shrubbery of the "Evergreen Hedge" bend at an angle to the axis of the twisted wire stems, while the needles of the "American Permahedge" are, or should be, perpendicular.[4] Barcana claimed that American Permahedge relied upon this difference to distinguish the Goodridge Patent when the Patent Examiner questioned the "American Permahedge's" novelty. Barcana argued further that the subject matter of its product had existed for many years prior to the filing of the '647 patent, a fact which should have foreclosed the patent's issuance.

As a result of Barcana's claims, American Permahedge conducted a validity study of the '647 patent in an attempt to locate any prior art that was not considered by the Patent and Trademark Office (the "PTO") when the patent was issued. American Permahedge thereafter submitted a Request for Reexamination of the '647 patent to the PTO for the purpose of considering the prior art located by the new search. The PTO granted the request, finding that a substantial new question of patentability affecting the claims of the '647 patent was raised by the request for reexamination.

Thereafter, on September 1, 1992, after conducting its review, the PTO issued a certificate reaffirming the validity of American

---

4. Barcana claims that an examination of the "American Permahedge" product reveals that the branches are not manufactured in accordance with the patent, as the needles are, in fact, bent at an angle to the axis of the wire stems, rather than perpendicular to the wire stems.

Permahedge's patent. Specifically, the PTO found that:

> There is no teaching in the prior art of using a decorative element as claimed assembled with a chain link fence so as to have the fence assume a hedge-like appearance. Also there is no decorative element taught by the prior art that has filaments extending laterally from a length of support and presenting a generally planar hedge-like or bush-like array.

*See* Reasons for Confirmation, dated July 6, 1992.

## C. The Instant Litigation

On August 20, 1992, American Permahedge filed the instant action in this Court, alleging that Barcana knowingly and willfully infringed Claims One, Four and Five of the '647 patent. Shortly thereafter, American Permahedge filed this motion for a preliminary injunction on that grounds that the continued manufacture, use or sale of the "Evergreen Hedge" will cause American Permahedge severe and irreparable injury.

Specifically, American Permahedge alleges that, while Barcana's "Evergreen Hedge" has been on the market, American Permahedge has been unable to arrange for the exclusive distributorship of its product. American Permahedge alleges further that specific deals have fallen through, including an offer in 1991 from a third party to distribute the "American Permahedge" product in Canada. That offer was withdrawn and given to Barcana. American Permahedge also alleges that it has experienced significant damage to its good will and has lost numerous opportunities to make sales, particularly as Barcana, unlike American Permahedge, is a large, multinational corporation with substantial resources at its disposal to market its "Evergreen Hedge." For example, an article in the September 1992 edition of "Home Improvement Center" magazine attributed the "American Permahedge" product to Barcana, indicating that Barcana, rather than American Permahedge, is being associated with the patented product. According to

American Permahedge, it will be forced out of business unless Barcana is enjoined from its activities.

In response, Barcana contends that Claims One, Four and Five of the "American Permahedge" patent are not infringed by Barcana's "Evergreen Hedge" and are, in fact, invalidated by prior art. According to Barcana, a critical claim of the '647 patent, which was relied upon by Paradise to distinguish his patent from prior art, was the angle of the needles. While the '647 patent calls for the lateral, *i.e.*, 90 degree, attachment of the bristles to the wire twig, the "American Permahedge's" needles are attached to the wire twig at 45 degree angles, thus forming a "V" shaped, rather than an "L" shaped array when viewed as a whole. Thus, "American Permahedge" is not being manufactured in accordance with its patent. Moreover, even if "American Permahedge" was manufactured in accordance with the '647 patent, the "Evergreen Hedge" does not infringe Claims One, Four and Five as its needles (1) are permanently bent at a 45 degree angle to the axis of the twisted wire twig, and thus, are not "lateral"; and (2) do not lie flat, in an orderly plane, but rather, are oriented in many directions, creating more of a three-dimensional look.

In reply, plaintiff maintains that, not only is its product manufactured in conformity with the '647 patent, but in addition, the precise angle at which the needles extend from the wire axis does not form any critical or inventive feature of the patent at issue. Rather, the invention resides in the formation of the shrubbery assemblies for use with a chain link fence.[5] As both the "Evergreen Hedge" and "American Permahedge" contain identical elements consisting of densely packed needles extending laterally from a wire support which are threaded through a chain link fence to create a hedge, the '647 patent is infringed.

## D. The Hearing

A consolidated hearing on American Permahedge's motion for a preliminary injunc-

---

**5.** Although Barcana does not sell chain link fences, Barcana does not dispute that its evergreen assemblies are to be combined with a chain link fence to create the appearance of a natural-looking hedge.

tion and Barcana's cross-motion for summary judgment was held on March 10, April 28, and April 29, 1993. At the hearing, Eugene Rzucidlo ("Rzucidlo"), plaintiff's expert, testified as follows.

Claim One of the '647 patent recites an artificial hedge and/or shrubbery assembly requiring certain elements: (1) a chain link fence; and (2) the presence of a plurality of camouflage assemblies. *See* Transcript of Hearing, dated March 10, 1993 ("Tr."), at 17. Rzucidlo testified further that one of the elements necessary for the '647 patent was that the needles are fastened and carried on a twig, and that the needles extend laterally from the twig. However, "laterally does not necessarily include perpendicular. Laterally simply means extending from the side." Tr. at 18; *see also* Transcript of Continued Hearing, dated April 28, 1993 ("Tr2."), at 5. More exactly:

The claim requires that there be a central elongated axial support element. Clearly this [the "American Permahedge"] has a central axial support element, and it is a relatively stiff support element. It goes on to say that the element must have relatively stiff, densely packed filament means fixedly carried by the support element. Your Honor can see that we have elements extended from the support and, of course, fixedly attached to it. It further says that they extend laterally from the axis of the support, those are the claims, they extend laterally.... These of course extend laterally, they extend from the side of these things. Laterally, of course, means from the side.... Branches on the tree are lateral to the trunk of the tree. Lateral includes anything extending to the side, and these do that.

Tr. at 21. Thus, according to Rzucidlo, the term "lateral" was not limited so as to require that the needles extend perpendicularly at a 90 degree angle to the axis.

With respect to the planar array, Rzucidlo testified further that "[t]he planar array is the planar array which is obtained after inserting this element into the fence, so that you get in the plane of the fence, in planes of the fence, back side, either side, an appearance of a hedge ... you can see here that this plane looks certainly like a hedge, forms a hedge-like planar array and that back side does also. The plane of the fence itself is the planar array that they're talking about." Tr. at 22. Thus, according to Rzucidlo, the term "planar array," when read in conjunction with the language of the claim that the combination of element and fence must form a hedge-like appearance, refers to the plane formed along the front and back surfaces of the fence when a multitude of branches are inserted.

With respect to Claim Four, Rzucidlo testified that Claim Four recites a combination of a decorative attachment and a wire fence. Tr. at 23. Specifically, he testified that:

Claim 4 describes the wire fence as having certain interwoven lengths of wire, and it basically describes what a chain link fence looks like before insertion of the elements. Claim 4 further describes and requires that the decorative attachment be or contain certain elements, and the elements are as follows: Length of cooperating pair of wires.... In these wires, these wires are twisted lengthwise, clearly twisted lengthwise about each other with laterally extending plastic fibers. Again, your Honor, you can see that these fibers extend from the side of these wires, they laterally extend from the wire itself—from the twisted wires.... They're engaged in the twist so you can see they're engaged and fixedly attached in the midst of the wires. The plastic fibers are required to be densely packed contiguously one another. Clearly ... these fibers are densely packed and they're basically one next to each other, contiguous to one another, such that the fibers present a generally planar hedge-like array, and here if we look at the fence and look at the appearance of the fence, we have a generally planar array and it is, of course, the hedge-like look for the fence. The rest of the claim talks about threading the elements through the fence and it talks about an operative position for threading through the fence, such that you have the attached relationship. In addition, the claim requires that the plastic fibers be able to bend along said wire length in the direction of the threading. If they thread

through the fence, the wires can bend, that's the bias and the bending movement. That is probably because of the stiffness and the resilience of this central wire. When that happens, they move through the fence and get a fence which contributes to the privacy and includes all of the openings.

Tr. at 24–25. Rzucidlo indicated further that Claim Five was the same as Claim Four except for the way it describes the fence and in the way the inserts are put into the fence. Tr. at 25. Rzucidlo also testified that the '647 patent calls for two elements, the fence and the interwoven branches. Accordingly, the whole concept or "combination" of two elements was the patented device. Tr. at 19.

Rzucidlo then explained that the Patent Examiner rejected some of the claims on the basis of the Goodridge Patent because the Goodridge Patent disclosed an element which looked like the "American Permahedge" branch, without the fence. Tr. at 20. At the time, the claim in question did not specifically recite the presence of a fence, but rather, "a camouflage unit useful to insert into a fence...." Tr. at 20. Thus, the Examiner would not consider the fence as a "positive limitation," but simply as an intended use. Tr. at 40. Because the fence was not part of the claim, the camouflage assembly by itself was rejected as being anticipated by Goodridge. Tr. at 41. Thereafter, Claim One was amended to recite the hedge in combination with a chain link fence. Tr. at 43.

Finally, Rzucidlo testified that the elements of the "Evergreen Hedge," namely (1) the centrally elongated axial support or twig; and (2) relatively stiff, dense, filament needles carried on the central axial support; (a) extending laterally from the axis; and (b) forming a bush-like planar array are covered by Claims One, Four and Five of the Permahedge patent. Tr. at 28–32; Tr2. at 25.

In opposition, Barcana introduced the testimony of two witnesses, Lester Horwitz ("Horwitz") and Terrence Weiner ("Weiner"). Horowitz testified that the term "lateral"

must mean perpendicular as (1) the '647 patent was approved only after the patentee emphasized to the examiner that the needles were not bent at an angle, like the Goodridge Patent, but rather, perpendicular to the stem, Tr2. at 112–113, 119; (2) the patent specification indicates that, when the branches are woven through the chain link fence, the needles should be fluffed out to be perpendicular, *id.* at 113; and (3) the patent drawings demonstrate that the needles are perpendicular and line up so a plane is formed, *id.* at 113–14.

As to the planar array, Horowitz testified that the term "planar array" refers to the individual branch, and not the plane of the fence. Tr2. at 116–17. Similarly, Weiner, executive vice president of operations for the Los Angeles, California factory of Barcana, testified that the term planar array referred to an even alignment of the tips of the needles, and that the "Evergreen Hedge" is not a planar array, but multi-dimensional. Tr2. at 59–60, 61. Thus, the planar array did not refer to the hedge-like appearance, but rather, to the arrangement of the needles along the wire support axis or twig. Tr. at 65.

## DISCUSSION

■■■ To obtain a preliminary injunction in a patent case, a party must establish: (1) a reasonable likelihood of success on the merits of the case; (2) irreparable harm if the injunction is not granted; (3) a balance of hardships tipping in the movant's favor; and (4) that the injunction would not harm the public interest. *Oakley, Inc. v. International Tropic–Cal, Inc.,* 923 F.2d 167, 168 (Fed. Cir.1991); *Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451 (Fed.Cir.1988); *Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1270–73 (Fed.Cir.1985).[6]

## I. Likelihood of Success on the Merits

The first factor required to establish entitlement to a preliminary injunction is a reasonable likelihood of success on the merits. *Hybritech Inc. v. Abbott Labs.,* 849 F.2d at

---

6. The law of the Federal Circuit, rather than the Second Circuit, provides the standards governing the issuance of an injunction against patent infringement. *Hybritech Inc. v. Abbott Labs.,* 849 F.2d at 1451 n. 12.

1451. Specifically, a patent holder must show a likelihood of success on the merits as to the issues of the validity of its patent and infringement. *Id.; see also Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1578 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

## A. Validity

■ Upon issue, a patent is endowed with a statutory presumption of validity pursuant to 35 U.S.C. § 282,[7] which is strengthened where, as here, the patent undergoes reexamination. *E.I. Du Pont de Nemours & Co. v. Cetus Corp.*, 19 U.S.P.Q.2d 1174, 1990 WL 305551 (N.D.Cal.1990). To overcome this presumption of validity, the defendant must prove with "clear and convincing" evidence that the PTO failed to meet its obligation of issuing only valid patents. *Id.; see also Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed.Cir.1988); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 960 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984); *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 645 F.Supp. 206, 209 (N.D.N.Y.1986), *aff'd*, 821 F.2d 646 (Fed.Cir.1987).

Defendants contend that the '647 patent is invalid under 35 U.S.C. § 102 on the bases of anticipation by prior public use and anticipation by prior art. Defendants contend further that the '647 patent is invalid pursuant to 35 U.S.C. § 103 on the grounds of obviousness. The Court disagrees.

## 1. Prior Use

■ A patent is invalid by prior use under 35 U.S.C. § 102(a) & (b) if "the invention was known or used by others in this country ... before the invention thereof by the applicant," *see* 35 U.S.C. § 102(a), or was "in public use or on sale" in this country more than one year before the patent application was filed, *see id.* at § 102(b). In order to prove anticipation by prior public use, the defendant must establish by "clear, cogent, and convincing" evidence, *see E.I. du Pont de Nemours & Co., Inc. v. Berkley & Co.*, 620

F.2d 1247, 1261 (8th Cir.1980), that the complete concept of the invention, as opposed to incidental use of some features of the product, was reduced to practice. *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

In an effort to establish anticipation by prior public use, Barcana offers the uncorroborated testimony of defendant National Metal Industries' president, Norman Levy ("Levy") and employee, Stanley Senhouse ("Senhouse"), that artificial greenery interwoven through the links of a chain link fence was employed as early as 1950. Specifically, Levy asserts that:

> During the holiday seasons from 1950 to 1980, there would be gates outside the hardware store and in the display window of Mr. Levy Hardware, Co. that were decorated with artificial greenery, specifically garlands woven through the links of diamond shaped metal folds in the gates as well as wrapped around the gates.... National Metal first used artificial greenery interwoven through the links in a chain link fence in 1979 as displays in its window.

Declaration of Norman Levy, executed on December 23, 1992, at 1–2. Similarly, Senhouse contends that:

> From 1950 to 1979, each Christmas season, gates outside and in the display window of the hardware store of M. Levy Hardware Co. were decorated by the Levy family with artificial green garlands interwoven through the metal V-shaped links and wrapped around the sides of the gates.

Declaration of Stanley Senhouse, executed on December 23, 1992, at 1.

Courts have routinely held, however, that uncorroborated oral testimony to prove prior use must be scrutinized closely and is insufficient to prove invalidity unless it is strong, clear, and convincing. *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed.Cir.1986); *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d at 1261; *Pentech Int'l, Inc. v. Hayduchok*, 18

---

**7.** 35 U.S.C. § 282 provides, in relevant part, that: "A patent shall be presumed valid.... [and] The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

U.S.P.Q.2d 1337, 1341, 1990 WL 180579 (S.D.N.Y.1990). Indeed, "the oral testimony of witnesses, speaking only from memory in regard to past transactions has, in the absence of contemporaneous documentary or physical evidence, consistently been found to be of little probative value ... [and] insufficient to show anticipation ... of an issued patent." *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 75, 213 Ct.Cl. 395 (1977) (citations omitted); *see also Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d at 138 ("oral testimony ... to prove prior knowledge or use ... must be regarded with suspicion and subjected to close scrutiny.").

■ In this case, the uncorroborated testimony of two interested parties is hardly the strict proof required to prove anticipation by prior public use. First, defendants' evidence rests exclusively upon the oral testimony of two witnesses who purportedly remember the Christmas decorations of a hardware store forty years after the fact. Barcana did not produce any documentary evidence, such as photographs of the decorated storefront, that would provide support for their claim. In addition, both of these witnesses, as employees of defendant National Metal Industries, have a clear interest in the outcome of this litigation. *See Deering v. Winona Harvester Works*, 155 U.S. 286, 301, 15 S.Ct. 118, 123–24, 39 L.Ed. 153 (1894) (noting that the suspicious nature of oral testimony is heightened when it comes from interested parties, such as prior inventors, alleged infringers, or employees of parties to the litigation); *Lockheed Aircraft Corp. v. United States*, 553 F.2d at 75. Moreover, this testimony does not establish each of the elements embodied in the '647 patent. Both Levy and Senhouse merely stated that Christmas garlands were woven through the openings of a chain link fence for decoration. Missing in the testimony offered by the defendants is any claim that the combination of the garlands and the chain link fence actually resembled a natural hedge, or that the garlands were being used for this purpose. As a result, defendants have failed to establish that the complete concept of the invention was reduced to public practice.

Under these circumstances, prior use by Levy Hardware, assuming such use existed, has not been satisfactorily proven to meet the clear and convincing standard. Accordingly, the Court does not find invalidity on the basis of prior use.

**2. Prior Art or Publication**

Relying on certain prior art references, defendants also attempt to establish that the patent is invalid as a result of anticipation by earlier patents and published disclosures. Specifically, defendants assert that the "American Permahedge" is anticipated by, *inter alia:* (1) patents showing interweaving greenery (Patent No. 1,933,280); (2) catalogs with artificial greenery products; (3) artificial hedges made with fences (Patent Nos. 679,976 and 719,605); and (4) camouflage materials woven through fences and camouflage nets (German Patent No. DE 738,878, Patent No. 2,362,786, and British Patent No. GB 552,514).

■ Prior art anticipates an invention, rendering it invalid, pursuant to 35 U.S.C. § 102, if a single prior art reference contains each and every element of the patent at issue, operating in the same fashion to perform the identical function as the patented product. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir.1991); *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d at 138. "There must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d at 1576; *see also E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.*, 706 F.Supp. 1135, 1142 (D.Del.1989), *aff'd*, 887 F.2d 1095 (Fed.Cir.1989) ("all of the same elements [must be] found in exactly the same situation and united in the same way ... in a single prior art reference") (quoting *Perkin Elmer Corp. v. Computervision, Corp.*, 732 F.2d 888, 894 (Fed.Cir.1984)). Thus, any degree of physical difference between the patented product and the prior art, *no matter how slight*, defeats the claim of anticipation. *E.I. du Pont de Nemours & Co. v.*

*Polaroid Graphics Imaging, Inc.,* 706 F.Supp. at 1142.

The Court finds that even a cursory examination of the references cited by defendants reveal that they are less relevant than the prior art considered by the Patent Examiner during the initial prosecution and reexamination of the '647 patent. For example, U.S. Patent Nos. 1,933,280 (*see* Volume III, Patents Cited by Defendants in Klar Declaration, at Exh. "K–20"), 679,976 (Exh. "K–22") and 719,605 (Exh. "K–23") all involve wire lattices, without diamond shaped openings, that are designed for use in combination with *live* greenery in order to promote the growth of an actual hedge. German Patent No. 738,-878 (Exh. "K–24") merely claims the combination of a wire fence with *fabric,* which is interwoven into the openings of a fence. Similarly, U.S. Patent No. 2,362,786 (Exh. "K–25") and British Patent No. 552,514 (Exh. "K–26") both claim camouflage means for concealing military or industrial objects, the first being composed of a flexible metal lattice and the second being composed of string netting. Neither patent even suggests the possibility of combining artificial greenery with a fence to produce a privacy hedge.

■ In addition, French Patent No. 862,-279 (Exh. "K–27") consists of pieces of material fastened to a wire lattice, U.S. Patent No. 1,922,298 (Exh. "K–28") claims an artificial hedge for Christmas tree gardens made from pine cones, U.S. Patent No. 2,305,567 (Exh. "K–29") covers a horizontal grid that is used for planting gardens and U.S. Patent No. 1,386,450 (Exh. "K–30") is drawn to an artificial hedge made from certain interwoven fabric over a frame support to be used as a stage setting. None of these patents contains all of the elements covered by the '647 patent. Similarly, additional literature showing pictures of artificial Christmas trees, wreaths and garlands that are displayed or advertised as Christmas decorations, not in combination with a chain link fence, does not anticipate the '647 patent. Accordingly, as these patents do not contain the same ele-

ments as the American Permahedge patent, the prior art cited by defendants does not support a finding of anticipation by prior art.

■ Moreover, plaintiff's patent was actually issued over prior art,[8] embodying the type of Christmas decorations described by the defendants. Courts have held that, where a patent in suit has been reissued after the PTO's consideration of prior art cited by a challenger, the challenger's burden of proof in overcoming the presumption of validity is more difficult to sustain. *America Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1364 (Fed.Cir.1984), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *E.I. du Pont de Nemours & Co. v. Cetus Corp.,* 19 U.S.P.Q.2d 1174, 1990 WL 305551 (N.D.Cal.1990) (recognizing that the reexamination procedure strengthens the presumption of validity, making that attacker's burden "heavier").

The PTO specifically considered prior art covering artificial Christmas trees and other artificial greenery when it determined that the '647 patent involved a combination that was not described by any of those patents. *See* Volume II Patents Cited in Reexamination Certificate Issue 9/1992 at Exhs. "7" (artificial branches), "8" (artificial shrubbery), "11" (artificial branch assemblies), "12" (artificial trees), "14" (artificial branches), "15" (artificial trees), and "18" (artificial shrubs). The Court regards the PTO finding as highly probative with respect to the prior art considered during the examination. After considering all the prior art cited by the defendants, the Court concludes that this prior art falls far short of anticipating the '647 patent.

## 3. Obviousness

■ Defendants also attempt to prove invalidity on the grounds that the '647 patent is rendered obvious by use of the Christmas garlands and prior art previously discussed. Pursuant to 35 U.S.C. § 103, "a patent may not be obtained ... if the differences between the subject matter sought to be pat-

---

**8.** Generally, all patents, publications, and prior uses which were in existence prior to the patent's date of invention or more than one year prior to the patent filing date are referred to as "prior art." *Mohasco Indus., Inc. v. E.T. Barwick Mills, Inc.,* 221 F.Supp. 191, 193 (N.D.Ga.1963), *aff'd,* 340 F.2d 319 (5th Cir.), *cert. denied,* 382 U.S. 847, 86 S.Ct. 61, 15 L.Ed.2d 86 (1965).

**319**

ented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The determination of whether a patent is invalid for obviousness requires inquiries into the scope and content of the prior art, the differences between the prior art and the claimed invention, and the level of ordinary skill in the area. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 619 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *Great Northern Corp. v. Davis Core & Pad Co.*, 782 F.2d 159, 165 (Fed.Cir.1986); *Carella v. Starlight Archery*, 804 F.2d at 139. Thus, the Court must determine whether a hypothetical person, having all the prior art at hand, would have found the same solution as plaintiff when addressing himself to the same problem.

Neither the prior use of greenery by defendant National Metal Industries, nor the prior art cited by defendants establish that the '647 patent is obvious. Defendants do not allege that persons skilled in fence assemblies would have believed the combination described by the '647 patent to be obvious. Moreover, despite the many years that chain link fences and artificial greenery have been sold, defendants have not offered one example of the individual garlands and chain link fences being sold with instructions to combine them into a natural-looking privacy hedge.

Thus, in sum, the Court finds that, as defendants have not sustained their burden of overcoming the statutory presumption of validity, there is a reasonable likelihood that the patent is not invalid.

**B. Patent Infringement**

To obtain a preliminary injunction, American Permahedge must also establish a likelihood of success on the merits with respect to infringement of its patent. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d at 1453. To succeed on the issue of patent infringement, the plaintiff must show either (1) that every ele-

ment in the American Permahedge patent is also found in defendants' "Evergreen Hedge," *i.e.*, literal infringement; or (2) that the "Evergreen Hedge" performs substantially the same function in substantially the same way to obtain the same result as the "American Permahedge," *i.e.*, equivalent infringement. *Union Carbide Corp. v. Tarancon Corp.*, 682 F.Supp. 535, 541 (N.D.Ga. 1988).

**1. Literal Infringement**

Determination of whether a patent has been literally infringed involves two inquiries: (1) the proper interpretation and scope of the patent's claims; and (2) whether each properly construed claim is found in the accused product. *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *Hybritech Inc. v. Abbott Labs.*, 849 F.2d at 1455; *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *Stiftung v. Renishaw*, 740 F.Supp. 1038, 1044 (S.D.N.Y.1990), *rev'd in part on other grounds*, 945 F.2d 1173 (Fed.Cir.1991). Where literal infringement is asserted, the prosecution history of the patents along with any arguments made during the prosecution history are relevant in determining the literal meaning of the claim terms. *Stiftung v. Renishaw*, 740 F.Supp. at 1045; *Eltech Sys. Corp. v. PPG Indus., Inc.*, 710 F.Supp. 622, 627 (W.D.La.1988), *aff'd*, 903 F.2d 805 (Fed. Cir.1990).

**a. The Proper Interpretation and Scope of the Patent**

As a threshold matter, Barcana contends that its "Evergreen Hedge" does not infringe plaintiff's "American Permahedge" product because the needles in defendants' product are bent at an angle to the axis, and therefore, are not "lateral" and also do not form a "planar array." Specifically, Barcana contends that an essential element of Claims One, Four and Five of the patent at issue, which plaintiff relied upon to distinguish the "American Permahedge" from prior art, was that the fibers forming the needles must extend laterally from the twisted wire twig to

form a planar array. Barcana interprets this specification, "laterally extending from the axis thereof" to mean that the needles can not be permanently bent at an angle to the wire twig, but must be at or about a right angle, *i.e.*, perpendicular. In support of its interpretation, defendants rely upon Figure "1" of the '647 patent, which shows the needles inserted through openings between twists of wire at right angles to the twisted wire surfaces. Defendants argue further that column 3, lines 25–33 of the '647 patent indicates that "manual fluffing of filaments 16 will tend to brush out any filaments 16 that remain other than *essentially perpendicular* from the support axis defined by wires 12 and 14" (emphasis added).

Defendants also contend that their product does not have a planar array. Specifically, defendants maintain that the fibers of the "Evergreen Hedge" are not aligned in an orderly, flat plane, and in fact, when viewed from the side, give the appearance of being disorderly and bushlike with fibers oriented in many directions and many planes. Finally, defendants claim that, as to the insertion of the branches into a chain link fence, the Patent Examiner indicated that such language in the claim was entitled to no patentable weight as it was "purely functional in the sense of intended use."

Contrary to defendants' assertion, American Permahedge responds that Barcana's "Evergreen Hedge," when combined with a chain link fence, contributorily infringes Claims One, Four and Five of the '647 patent. Specifically, American Permahedge contends that the "precise angle at which the filament extends laterally of the axis does not form any critical or per se inventive feature of the present invention." Rather, the point being made in relation to the Goodridge Patent is that the Goodridge fibers are "bunched together in discontiguous clumps, leaving defined spaces between each clump at the root, *i.e.*, where the wires are twisted," and thus, are not capable of forming shrubbery. There is no suggestion, as defendants contend, that the filaments of the camouflage assemblies must extend 90 degrees laterally of the axis in order to form shrubbery. The only finding is that "discontiguous clumps" cannot form shrubbery. Similarly, with respect to the term "planar," American Permahedge maintains that "planar array" does not refer to the alignment of the needles, but rather, to the overall look of the entire hedge.

**(1) The Meaning of "Planar" and "Lateral"**

The Federal Circuit holds that, in order to ascertain the true meaning of claim language, resort should be made to the claims, the specification and the prosecution history. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d at 1569–60. Claims should be construed as they would be by those skilled in the art and statements made during prosecution can limit the scope of these claims. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985). Although the patent law "allows the inventor to be his own lexicographer," *see id.* at 867, if the patent applicant has not indicated that he is using words in a manner different from their everyday usage, those words must be given such normal or customary meaning. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir. 1984); *Mark Indus. v. Mobile Scaffolding Management & Sales Inc.*, 12 U.S.P.Q.2d 1849, 1856 (C.D.Cal.1989) ("In order to properly interpret claims, the claim language must be read in accordance with the rules of the English language, using dictionary definitions to interpret words.").

Starting with the claims themselves, the precise language at issue in Claim One states that the patent covers:

> camouflage assemblies comprising a central elongated axial support element and relatively stiff densely packed filament means fixedly carried by said support element and extending *laterally* of the axis thereof, said filament means forming a *bush-like planar array* that extends along the entire length of said support element.

(emphasis added); *see also* Claim Four ("laterally extending plastic fibers ... present a generally planar hedge-like array"); Claim Five (same). At the hearing, Rzucidlo, plaintiff's expert, testified that, in Claims One, Four and Five, "laterally" simply meant "extending from the side," as the "angle is not a critical factor." Tr. at 18. He based this

conclusion on two factors: (1) that the term "lateral" must take its ordinary dictionary meaning as the term was not expressly defined in the patent and was not discussed in the prosecution history, Tr2. at 11; and (2) on reexamination, the patentee specifically pointed out to the Patent Examiner that he believed "lateral" meant extending from the side at an angle, and that the angle was not relevant with respect to that term. *Id.* at 15.

In addition, Rzucidlo testified that the term "planar array" can only refer to the plane of the hedge that is formed on either side of the fence by inserting a multitude of camouflage assemblies, or branches, through the openings of the fence. Tr. at 22. He explained that the term "planar array" must be read in connection with the other operative terms in the claim, including that the claimed combination must assume a hedge-like appearance. *Id.* at 23.

In opposition, defendants offered the testimony of Lester Horwitz in an effort to refute American Permahedge's interpretation of "lateral" and "planar." The gravamen of his testimony was that, in granting the '647 patent over the Goodridge reference, the term "lateral" was limited to require that the needles extend at a 90 degree angle to the twig. Tr2. at 112–116. He also contended that the term "planar array" does not refer to the plane of the hedge on either side of the fence, but rather to the alignment of the needle tips. *Id.* at 116–120.

Plaintiff's conclusion with respect to Goodridge, *i.e.,* that the filaments are not required to extend 90 degrees laterally of the axis, is consistent with the plain meaning of the term "lateral" which, used in accordance with its usual dictionary usage, means "coming from the side." *See* The American Heritage Dictionary (2d ed. 1976). There is nothing in the definition which would limit the term "lateral" to ninety degrees.

Moreover, in American Permahedge's "Response" to the PTO's certification for reexamination, plaintiff informed the Examiner that "[t]he invention resides in the formation of the camouflage assembly for use with a chain-link fence with filaments extending laterally of the axis either *at an angle or approximately 90 [degrees] or, in a more v-*

*shaped configuration as shown on the enclosed sample, or alternatively, in a position in between the preceding two."* *See* Response, annexed to the Declaration of Albert L. Jacobs, Jr., executed on October 2, 1992 (the "Jacobs Dec."), as Exh. "E" (emphasis added). Defendants' expert also stated that he believed the examiner read the response upon reexamination. Tr2. at 141.

■ On the other hand, the use of the word "perpendicular" is contained in the specification of the '647 patent as follows: "Manual fluffing of the filaments will tend to brush out any filaments that remain other than essentially perpendicular from the support axis." Tr2. at 138. Figure "1" of the '647 patent also illustrates that the needles radiate at right angles from the central twisted wire twig. Although particular limitations or embodiments appearing in the specification will not be read into the claims, *see Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d at 867; *see also Sjolund v. Musland,* 847 F.2d 1573, 1582 (Fed.Cir.1988), the specification may aid in ascertaining the scope and meaning of the language employed in the claims. *See Stiftung v. Renishaw,* 740 F.Supp. at 1044. Thus, the patent specification and drawings, which indicate that "lateral" is in fact "perpendicular," tend to support defendants' contention that the needles must be placed at right angles.

■ Most importantly, however, the Court is influenced by statements made during the prosecution of the '647 patent to the effect that lateral did mean perpendicular. Specifically, the Patent Examiner rejected the '647 patent, under 35 U.S.C. § 103, on the ground that it was referenced by the Goodridge Patent. Specifically, the Patent Examiner noted that "each group of fibers in Goodridge is located in its own plane or 'planar array.'" *See* Office Action dated January 19, 1989, annexed to the Affidavit of Lester Horwitz, sworn to on December 30, 1992 (the "Horwitz Aff."), as Exh. "H2." Arguing against this rejection, the patentee stated that the needles of Goodridge "are bent permanently at an angle to the axis so that a planar array capable of forming shrubbery is not possible. As a result, Goodridge

could not provide a densely packed contiguous planar array simulative of shrubbery. Goodridge provides a tree branch but not shrubbery." *See* Amendment, dated March 1, 1989, annexed to the Horwitz Aff. as Exh. "H4." In light of those statements, distinguishing "American Permahedge" by the angle of the needles, the Examiner withdrew the rejection of the claims. Having thus restricted the scope of its claims and differentiated the "American Permahedge" from the Goodridge Patent on the basis of the angle of the needles, plaintiff is estopped from now asserting that "laterally extending" means anything other than perpendicular. *See Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d at 870.

■ With regard to the term "planar array," the Court finds that this term describes the branches, themselves, rather than the overall hedge as plaintiff contends. The claims provide, in relevant part, that the needles must form "a bush-like planar array that *extends along the entire length* " of the central wire support (emphasis added). The specification provides further that "[f]ilaments extend or radiate laterally of wires *along the entire axial length of the twisted pair* in a bush-like rotative array" and when viewed edgewise, have "a flat, planar construction" (emphasis added). In addition, Figure "2" of the patent shows the needles radiating from the wire support in a two-dimensional, flat plane. Thus, the '647 patent requires that the fibers or needles held by the twisted axial support wires be set forth in a "planar array."

### b. Similarity of the two Products

The Court must next determine whether each properly construed claim in the '647 patent is found in the accused product. *Hormone Research Found. v. Genentech, Inc.,* 904 F.2d at 1562; *Hybritech Inc. v. Abbott Labs.,* 849 F.2d at 1455; *Fromson v. Ad-*

*vance Offset Plate, Inc.,* 720 F.2d at 1569; *Stiftung v. Renishaw,* 740 F.Supp. at 1044.

At the hearing, Rzucidlo testified that the "Evergreen Hedge," when combined with a chain link fence, is clearly covered by Claims One, Four and Five of the '647 patent. Specifically, Rzucidlo indicated that each product contains (1) a central wire support; and (2) relatively stiff, densely packed needles; (a) attached to the central wire support; and (b) extending laterally from the axis thereof. Tr. at 28. Rzucidlo also claimed that, when combined with a fence, the camouflage assemblies of both "American Permahedge" and the "Evergreen Hedge" form a planar array along the front and back of the fence which has the appearance of a natural-looking hedge. *Id.* at 30–32.

■ After examining both the '647 patent and the "Evergreen Hedge" product, the Court finds that plaintiff has not established a likelihood of success on the issue of literal infringement. As the plaintiff indicates, the "Evergreen Hedge" does contain certain essential elements of the '647 patent, namely a sturdy wire central support combined with filaments that are threaded through the twisted wires to form needles extending from the central axis. The "Evergreen Hedge's" needles extend in a v-shaped pattern or 45 degree angle from the wire support element, however, to form a branch unlike that described in the '647 patent. Thus, the "Evergreen Hedge" does not have needles which perpendicularly extend from the wire twigs. Moreover, the "Evergreen Hedge" is not "planar" in that, when viewed edgewise, the needles are not flat, but rather, protrude at various angles in a three-dimensional arc.[9] Thus, as not every claim of the '647 patent is reflected in the "Evergreen Hedge," the Court finds that American Permahedge has not shown a reasonable likelihood of success regarding Barcana's literal infringement of Claims One, Four and Five of the '647 pat-

---

**9.** This determination was made difficult by the fact that the exhibits of the Barcana product submitted by the parties differed as to the extent of "flatness." Specifically, plaintiff's exhibit of the Barcana product appeared flattened, whereas, defendants' exhibits appeared more bush-like and bristly. Comparing exhibits of both the "American Permahedge" and "Evergreen

Hedge", however, the Court finds that (1) "American Permahedge's" needles are not perpendicular to the axis; and (2) the Barcana "Evergreen Hedge" unit was actually more "planar" or flat, than the "American Permahedge," leading the Court to conclude that the "American Permahedge" unit is not being manufactured according to the claims in the patent.

ent. *See Builders Concrete Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 257 (Fed.Cir.1985) ("[l]iteral infringement requires that the accused devise embody *every* element of the claim") (emphasis added).

**2. The Doctrine of Equivalents**

Infringement under the doctrine of equivalents requires that the accused device perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed.Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d at 761; *Raytheon Co. v. Roper Corp.*, 724 F.2d at 961. The doctrine was created for situations where there is no literal infringement but liability is nevertheless appropriate "to prevent what is in essence a pirating of the patentee's invention." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d at 870; *see also Hormone Research Found. v. Genentech, Inc.*, 904 F.2d at 1564. The doctrine does not mean, however, that the Court can ignore claim limitations. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987) ("Though the doctrine of equivalents is designed to do equity ... it is not designed to permit wholesale redrafting of a claim to cover nonequivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change.") (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33 (Fed.Cir.1987)).

Comparing the "Evergreen Hedge" with the claimed invention, the Court finds that the two differ in two respects—the angle and flatness of the needles. This difference not only precludes a finding of literal infringement, but also, a finding of infringement under the doctrine of equivalents. In reaching this conclusion, the Court must consider whether, given these differences, the claimed invention and allegedly infringing product can perform substantially the same function in substantially the same way to achieve substantially the same result. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d at 870. Relying once again on the prosecution history, the Court notes that the plaintiff argued to the PTO that needles which "are bent permanently at an angle to the axis" are incapable of forming "a planar array." *See* Amendment, annexed to the Horwitz Aff. as Exh. "H4." This limitation was vital to the patentability of the "American Permahedge." In comparison, then, an artificial greenery unit which consists of bent needles does not function in substantially the same way as the '647 patent even when threaded through the holes of a chain link fence. Thus, while the "Evergreen Hedge" does create the appearance of a natural-looking privacy hedge, it creates this appearance in a different way from the claimed invention. Accordingly, the Court finds that the plaintiff has not established a reasonable likelihood of success on the merits with respect to infringement of its product pursuant to the doctrine of equivalents.

**II. Irreparable Harm**

The second factor a party seeking a preliminary injunction must establish is that it will suffer irreparable harm if the preliminary injunction is not granted. With respect to irreparable harm, it is well settled that, in patent infringement cases, such harm is normally presumed once continuing infringement and patent validity are clearly established. *Smith Int'l Inc. v. Hughes Tool Co.*, 718 F.2d at 1581; *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987); *Henkel Corp. v. Coral, Inc.*, 754 F.Supp. 1280, 1321 (N.D.Ill.1990), *aff'd*, 945 F.2d 416 (Fed.Cir.1991). Such presumption of injury is not, however, irrebuttable. *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d at 390. For example, courts have refused to find irreparable injury where the alleged infringer is solvent and money will adequately compensate the injury. *See, e.g., Nuclear–Chicago Corp. v. Nuclear Data, Inc.*, 465 F.2d 428, 430 (7th Cir.1972).

In the instant matter, American Permahedge alleges that continued, unauthorized infringement by Barcana significantly diminishes the value of the "American Perma-

hedge" patent not only in terms of lost sales to American Permahedge, but also in its ability to enter exclusive distributorship deals that would serve to sell and promote the product. Specifically, Michael Paradise, American Permahedge's president, testified that American Permahedge (1) has been unable to secure financing for the business because "potential investors ... won't invest in a patented product if it is not an exclusively patented product," Tr2. at 44; (2) is "having trouble getting exclusive distributorship for our product for the same reasons that they won't take on an exclusive distributorship of a product if there is another product on the market," *id.;* and (3) has lost substantial customers, including one of its largest distributors, National Metal, due to Barcana's product on the market, *id.* at 43. In addition, American Permahedge claims that, as Barcana's product is inferior, its presence in the market creates damage to American Permahedge's goodwill in the industry. Finally, American Permahedge maintains that a recovery of royalties of Barcana's past sales will not adequately compensate American Permahedge, as American Permahedge will, in all likelihood, be forced out of business.

In response, defendants raise several arguments in an effort to undercut plaintiff's showing of irreparable harm, namely, (1) such harm is belied by American Permahedge's delay in bringing this action; (2) monetary damages are adequate; (3) American Permahedge's product is not covered by the claims of the '647 patent and thus, Barcana is not competing with American Permahedge in the marketplace; and (4) American Permahedge has a poor reputation in the marketplace.

## A. Delay

Barcana first contends that plaintiff's delay in bringing this action severely undercuts its claim of irreparable harm. In the instant case, plaintiff admits that it knew of the "Evergreen Hedge" in June 1991 but delayed filing this lawsuit until August 24, 1992, nearly 15 months later. During the 15 month interim, Barcana appeared at and exhibited its "Evergreen Hedge" product at trade shows where plaintiff was present or knew of Barcana's participation. *See* List of Attendees at the January 1992 IFIA Fence–Tech trade show in Dallas–Fort Worth, annexed to the Declaration of Richard Klar (the "Klar Dec."), as Exhs. "K–1" and "K–2." Barcana also indicates that, at each trade show, plaintiff's counsel threatened to bring suit, but did not. *See* Declaration of Peter Barthelmess, executed on December 22, 1992, at 2. Barcana further alleges that, during the 15 month interval, it expended considerable monies marketing, advertising and developing its customer base for the "Evergreen Hedge." *See* Klar Dec. at Exh. "K–31."

American Permahedge replies that there has been no delay, as American Permahedge's counsel contacted Barcana promptly upon learning of the infringement, notified Barcana of the infringement, sent a copy of the '647 patent and told Barcana that American Permahedge intended to enforce its rights. This suit was filed as soon as the patent reexamination proceeding was complete.

Preliminary injunctions generally are granted where there is an urgent need for speedy action to protect a party's rights. *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985). In this case, American Permahedge refrained from moving for preliminary relief until more than a year after it discovered Barcana's alleged infringement. American Permahedge's failure to act sooner " 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.' " *Id.* at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y.1979)); *see also T.J. Smith & Nephew, Ltd. v. Consol. Medical Equip., Inc.,* 821 F.2d 646, 648 (Fed.Cir. 1987) (fifteen month delay in seeking a preliminary injunction rebuts the presumption of irreparable harm); *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984) ("[d]elay in seeking relief, however, undercuts any presumption that infringement alone has caused irreparable harm *pendente lite* ... and suggests that there is, in fact, no irreparable injury."); *Nina Ricci S.A.R.L. v. Gemcraft Ltd.,* 612 F.Supp. 1520, 226 U.S.P.Q. 575, 583

(S.D.N.Y.1985) (holding that plaintiff's inexplicable delay of six weeks in seeking a preliminary injunction is evidence that limited harm was incurred); *Le Sportsac, Inc. v. Dockside Research Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979); *Rexnord, Inc. v. Laitram Corp.*, 628 F.Supp. 467, 473 (E.D.Wis.1986) (holding that the defendant's "failure to promptly commence a suit is fatal to [their] contention of irreparable harm"). As American Permahedge has not offered an adequate excuse for its delay, the Court finds that such delay is fatal to plaintiff's claim of irreparable injury. Accordingly, the motion for a preliminary injunction is denied.[10]

## III. Motion for Summary Judgment

Barcana has also cross-moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the basis of non-infringement and invalidity of the '647 patent.

### A. Standard of Law

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–35, 106 S.Ct. 2548, 2552–59, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir.1988); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. United States Fire Ins. Co.*, 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. at 330, n. 2,

---

**10.** Having determined that plaintiff has not shown either a reasonable likelihood of success on the merits or irreparable harm, the Court does not reach the remaining two prongs of the preliminary injunction standard.

106 S.Ct. at 2556, n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *see also Weg v. Macchiarola*, 654 F.Supp. 1189, 1191–92 (S.D.N.Y.1987).

**B. The Instant Action**

 Summary judgment is appropriate in a patent infringement case where, for example, "a properly interpreted claim with an uncontested description of the accused device reflects the absence of a genuine issue of material fact." *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 973 (Fed.Cir.1985). When the meaning of the term of a patent claim is disputed and extrinsic evidence is necessary to explain that term, however, an underlying factual question arises and the claim construction must be left to the jury. *Id.* at 974; *see also Union Carbide Corp. v. Tarancon Corp.*, 682 F.Supp. 535, 540 (N.D.Ga.1988). Similarly, a finding of equivalence is a determination of fact. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. at 609–10, 70 S.Ct. at 856–57.

In the case at hand, Barcana contends that there is no material fact in dispute as to non-infringement and invalidity of the '647 patent. The Court disagrees. First, with respect to the issue of invalidity, the Court has already determined that there is a reasonable likelihood that the patent is not invalid. *See* Discussion, *supra*, at 316–323. Second, with respect to infringement, although a reasonable juror could conclude that the plaintiff has not established a likelihood of infringement for purposes of obtaining a preliminary injunction, the record is simply replete with too many factual issues to make this determination as a matter of law. *See Howes v. Medical Components, Inc.*, 814 F.2d 638, 646 (Fed.Cir.1987) ("Summary judgment should not have been granted where there are "too many unresolved fact issues" to properly construct the scope of [the] claims."); *Palumbo v. Don–Joy Co.*, 762 F.2d at 976 ("if ambiguity is thought to surround the prosecution history in this case, that could give rise to a question of fact underlying the legal question of claim construction."). Accordingly, defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is denied.

**CONCLUSION**

For the reasons set forth above, American Permahedge's motion, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, and Barcana's cross-motion for summary judgment under Rule 56 are denied.